UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

       12  CR 205 (RPP)

    -   v. -

**OPINION & ORDER**

BENNY DIMARCO,

                    Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

**I.     INTRODUCTION**

      Defendant Benny DiMarco ("DiMarco") is charged in a three-count indictment with

being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); possessing a

firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k); and possessing an

unregistered firearm silencer in violation of 26 U.S.C. §§ 5845(a) and 5861(d).  (Indictment,

Mar. 7, 2012, ECF No. 11.)  Now pending before the Court is DiMarco's June 25, 2012 motion

to suppress photographs of digital pictures that were stored on his cell phone and which depicted

the firearm that he is alleged to have possessed at the time of his arrest.  (Mot. to Suppress, ECF

16.)  These photographs were taken on February 2, 2012 by a federal agent who performed a

warrantless search of DiMarco's Samsung "flip" cell phone more than six hours after DiMarco

was arrested by the New York City Police Department ("NYPD").  In addition to these

photographs, DiMarco also seeks to suppress any evidence that was obtained when, on April 17,

2012, the Government attempted to execute a search warrant for the Samsung flip cell phone that

he possessed at or about the time of his February 2, 2012 arrest.  For the reasons discussed

below, the Court grants DiMarco's motion to suppress the photographs of the digital pictures

stored on his cell phone and dismisses as moot DiMarco's motion to suppress any evidence that

was obtained from the Government's April 17, 2012 search of his cell phone.

II.     **FACTUAL BACKGROUND**

   A.  **The Arrest of Benny DiMarco**

DiMarco was arrested by the NYPD on February 2, 2012 after officers in the NYPD

Anticrime Unit for the 43rd Precinct received a tip from a confidential informant that a gun sale

would be taking place in front of 1740 Mulford Avenue in the Bronx.  (See Tr. of Mot. to

Suppress Hr'g ("Tr.") at 5-6, Sept. 12, 2012, ECF No. 24.)  The tip included information that

there would be a car at this location and that one white male "with hair" would be selling a

firearm and that he would be accompanied by another white male who "was bald and shorter and

stockier."  (Id.)  At around 1 p.m., NYPD Officer Robert Fischer ("Officer Fischer"), Officer

Stephen Jones ("Officer Jones"), and several other Anticrime Unit officers acted on this tip and

drove in two unmarked cars to Mulford Avenue, where they set up surveillance approximately

fifty yards south from the location of the anticipated gun sale.  (Tr. at 8-10, 132-33.)

While conducting this surveillance, the officers saw a black car drive up to and double-

park in front of 1740 Mulford Avenue.  (Tr. at 9-10, 133.)  Officer Fischer testified that he

observed a white male with hair, whom he subsequently identified as DiMarco, (Tr. at 12),

approach the driver side of the vehicle and talk to the driver of the black car, (Tr. at 9-10).

Officer Fischer stated that DiMarco then walked to the rear of the black car and tapped on the

trunk, but that it did not open.  (Tr. at 10, 63.)  While DiMarco was standing at the trunk, Officer

Fischer stated that he saw DiMarco holding a white plastic bag with what appeared to be a box

inside of it.  (Id.)  Officer Fischer next observed DiMarco walk around to the passenger side of

the vehicle.  (Tr. at 10.)  Officer Jones testified that, from his vantage point in the surveillance,

he was able to see DiMarco walk over to the black car with a white plastic bag in his hand.  (Tr.

at 133.)  Officer Jones stated that he too saw DiMarco tap on the car's trunk, but that it did not

open, and that DiMarco then tried to open the rear door on the car's passenger side.  (Id.)

Next, Officer Fischer, Officer Jones, and the other officers drove towards the double-parked black car at 1740 Mulford Avenue. (Tr. at 9-11, 133-34.) As the officers approached, the black car drove off. (Id.) Officer Fischer testified that he saw DiMarco give "a very surprised look" at the police, walk to the sidewalk, drop the white plastic bag at the foot of a tree, and continue walking towards two men on the sidewalk. (Tr. at 10; see also Test. of Officer Jones, Tr. at 133.) Officer Fischer testified that he drew his weapon and ordered DiMarco and the two other men to the ground. (Tr. at 12.) Officer Jones recovered the dropped plastic bag and handed it to Officer Fischer, (Tr. at 133), who proceeded to give a quick look into the bag, (Tr. at 12). Inside, Officer Fischer saw a black firearm, two magazines, a box containing ammunition, and a silencer. (Tr. at 12-13.) Officer Fischer then left the scene in his vehicle to pursue the black car that the officers had observed outside of 1740 Mulford Avenue. (Tr. at 14, 133.) As he departed, Officer Fischer took the plastic bag and its contents with him. (Id.) His search for the black car proved unsuccessful and he returned to the 43rd Precinct fifteen minutes later. (Tr. at 14-15.)

After Officer Fischer had left the scene, Officer Jones arrested and handcuffed DiMarco. (Tr. at 133.) In the process of making the arrest, Officer Jones took everything out of DiMarco's pockets, including his cell phone, "to see if he had any more weapons on him, [or] if he had anything that would be dangerous to [Officer Jones] or the members of [his] team."[1] (Tr. at 134-35; see also Gov't Ex. 4.) Officer Jones placed DiMarco in the back of the police vehicle for transport to the 43rd Precinct, (Tr. at 135), which was located a five to ten minute drive away,

---

[1] At the Suppression Hearing, counsel for DiMarco asked Officer Jones, "as a general matter, in the course of going through someone's pockets at the scene of an arrest, when you find non-dangerous items, not guns, not knives, what do you do with them?" (Tr. at 134-35.) Officer Jones replied, "I usually either leave [them] in the pocket—but I believe in this case I took everything out of the pockets" and "gave the property, whatever Mr. DiMarco had in his pockets, to Officer Fischer [w]hen we started the arrest proceedings." (Id.)

depending on traffic, (Tr. at 8).  The time of the arrest was later recorded by Officer Fischer as

1:15 p.m.  (Tr. at 69-70; see also Gov't Ex. 3.)

### B.  Processing of Evidence Recovered During DiMarco's Arrest

The "first order of business" to take place in processing the property recovered during

DiMarco's arrest was for the NYPD's Emergency Services Unit to make the weapon—later

identified as a defaced, black, .380 caliber RPB Industries automatic firearm—safe.  (Tr. at 15-

17, 23; Gov't Ex. 5.)  At the request of Officer Fischer, who had primary responsibility for the

post-arrest processing, the Emergency Services Unit ("ESU") came to the 43rd Precinct around

2:30 p.m.  (Id.)  Office Fischer then contacted the NYPD's Evidence Collection Team ("ECT")

to swab the weapon for DNA and fingerprints, (Tr. at 21), which it did around 4:00 p.m., (see

Gov't Ex. 1).  Between 5:30 and 6:00 p.m., NYPD officers filled out various pieces of

paperwork related to the case, including a Complaint Form and an Arrest Report.  (Id.)  At

approximately 6:30 p.m., NYPD officers fingerprinted and photographed DiMarco.  (Id.; Tr. at

22-23.)

Vouchering of the property collected at the scene followed next.  (Tr. at 32-55; see also

Gov't Exs. 4-7.)  Automatically-generated timestamps on the voucher invoices reveal that the

weapon, the silencer, and fifty-five rounds of ammunition were vouchered between 6:43 and

7:12 p.m., (Gov't Ex. 5); the white plastic bag and the box that had been inside of the bag were

vouchered between 7:23 and 7:41 p.m., (Gov't Ex. 6); and DiMarco's cell phone and cell phone

battery were vouchered between 7:56 and 8:06 p.m., (Gov't Ex. 4).  These vouchers were

approved by Sergeant James Kelly between 8:00 and 9:00 p.m.  (Gov't Exs. 1, 4-6.)  At 10:33

p.m., DiMarco's wallet and keys were vouchered.  (Gov't Ex. 7.)  Officer Fischer testified that

the length of time it had taken to process DiMarco along with all of the other evidence in the

case was "typical" for a firearm arrest in the 43rd Precinct.  (Tr. at 79.)

### C.  The Involvement of The Bureau of Alcohol, Tobacco, Firearms, and Explosives

At some point in the late afternoon or early evening, the NYPD Anticrime Unit contacted Special Agent Veronica Morales ("Agent Morales") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and informed her that an automatic weapon, lacking a serial number, and a silencer had been recovered.[2]  (Tr. at 74-76, 82-83; Gov't Ex. 4.)  Agent Morales received this call around sunset while driving on the West Side Highway, and went directly to the 43rd Precinct with the purpose of "looking at the evidence, finding out more about the arrest," and determining "if the situation would qualify for federal prosecution and if it was a case that [ATF] should take."  (Tr. at 84, 104-06.)  When Agent Morales arrived at the 43rd Precinct, she received a brief summary of the events surrounding DiMarco's arrest and met with Officer Fischer and some of the other Anticrime Unit officers.  (Tr. at 85-87.)  She observed that the officers were processing evidence from the arrest and that this evidence was sitting on a table in the precinct.  (Id.)  Agent Morales "asked permission to handle the evidence," and after receiving such permission, she examined the cylinder-shaped item to determine if it was a silencer.  (Tr. at 87.)  She also looked at the weapon and thought it might be a fully automatic machine gun.  (Tr. at 87-88.)  Agent Morales then asked if "anyone had looked through" DiMarco's cell phone.  (Id.)  Learning that nobody had, she proceeded to look through the phone.  (Id.)

### D.  The Examination of DiMarco's Cell Phone

In conducting her look through of DiMarco's cell phone, Agent Morales first removed the battery from the back of the phone, which she described as "a flip phone—the type of phone that you have to flip open in order to speak on it"—and took note of several identifying numbers

---

[2]At the Suppression Hearing, Agent Morales testified credibly as to when she arrived at the 43rd Precinct.  The photograph that Agent Morales took of DiMarco's cell phone was time-stamped at 7:40 p.m., (Gov't Ex. 8, 10), and the voucher for the cell phone shows that the phone had been vouchered by 9:00 p.m, (Gov't Ex. 4.)

on the phone.  (Tr. at 88.)  She then reinserted the battery, turned the phone on, and scrolled

through the pictures, text messages, and phone numbers stored on the phone.  (Tr. at 88-89, 112-

13.)  To access this information, Agent Morales opened, navigated, and exited multiple menu

options on the phone's graphic interface.  (Tr. at 90-91, 112-14.)  Agent Morales explained that

her purpose in performing this search was "to see if there was any evidence on th[e] phone

linking it to . . . the person that they had arrested and the firearm that was there."  (Tr. at 89.)

Agent Morales further explained that she thought there was a chance that a picture of the gun

was on DiMarco's phone because, in her experience as an ATF Special Agent, she was

"notic[ing] more and more the use of phones to capture images of products to be sold, either

narcotics, firearms, cigarettes."  (Id.)  When questioned about why she did the search right then,

Agent Morales stated that:

> I wanted to preserve the evidence.  I wasn't sure—I've never met
> this police officer.  I don't know what his particular process is.  I
> know what the general process is for handling evidence.  But if
> there was anything on that phone that was of value, I wanted to be
> able to capture it right there.

(Id.)

While looking through the photographs stored on DiMarco's cell phone, Agent Morales

found three or four pictures depicting a firearm that was the same color and the same shape of

the firearm recovered during DiMarco's arrest.  (Tr. at 91.)  The pictures showed the firearm in

various positions and included some images in which "a cylinder item" very similar, if not

identical, to the silencer recovered during DiMarco's arrest was attached to the muzzle of the

firearm.  (Tr. at 92-93.)  Agent Morales used the camera on her iPhone to take pictures of the

digital images that she saw on DiMarco's cell phone.[3]  (Tr. at 91-94, 114; Gov't Ex. 8.)  She

---

[3] Agent Morales later used her desktop computer to view the pictures that she had taken with her iPhone.  On her
computer, Agent Morales also performed a "screen shot" allowing her to view the properties of her iPhone

explained that she took the photos with her iPhone because "she didn't want to take the chance that the pictures [on DiMarco's cell phone] might either accidentally be erased or that something would have happened to the phone where [she] couldn't access those pictures again."  (Tr. at 91.)

After Agent Morales completed her search of DiMarco's cell phone, she turned off the phone and asked the Anticrime Unit officers if they had debriefed DiMarco and "if they minded that [she] would debrief him."  (Tr. at 95.)  Agent Morales, joined by Officer Fischer, NYPD Intel Sergeant Wilson Ortiz, and a NYPD detective, then attempted to interview DiMarco.  (Tr. at 86, 96, 124.)  DiMarco refused to speak with them and requested a lawyer.  (Id.)  Agent Morales contacted her supervisor and the decision was made not to arrest DiMarco, but "to wait until [they] got confirmation from . . . the NYPD Lab Ballistics Unit wh[ich] evaluates guns and could give [her] an expert determination as to whether or not the firearm was in fact fully automatic."  (Tr. at 97.)  Agent Morales then left the precinct.  (Id.)  At 2:05 a.m. on February 3, 2012, Officer Fischer left the precinct.  (Tr. at 53.)  At that point, DiMarco had still not been brought to central booking.  (Id.)  DiMarco was arraigned in New York Supreme Court, Bronx County, for the criminal possession of a weapon on February 4, 2012.  (Decl. of Steven M. Statsinger in Supp. of Mot. to Suppress ("Statsinger Decl.") ¶¶ 3-4, June 6, 2005, ECF No. 17.)

### E.  The Prosecution of a Federal Case Against DiMarco

About one week after the NYPD arrested DiMarco, the United States Attorney's Office for the Southern District of New York decided to prosecute the case against DiMarco federally. (Statsinger Decl. ¶ 5.)  Prior to this decision, however, the NYPD had authorized the release of the cell phone seized from DiMarco.  (See Gov't Post H'rg Mem. in Opp'n to Mot. to Suppress ("Gov't Post Hr'g Mem.") at 11-12, ECF No. 28; see also Gov't Mem. in Opp'n to Mot. to Suppress ("Gov't Opp'n Mem.") at 2-3, ECF No. 19.)  On April 12, 2012, the United States

---

photographs.  (Tr. at 100.)  This screen shot, identified as Government Exhibit 10, shows that a photograph of the gun images on DiMarco's cell phone was taken at 7:40:04 p.m. on February 2, 2012.  (Gov't Ex. 10.)

Attorney's Office filed an application for a warrant to search the cell phone that DiMarco had in his pocket at or about the time of his arrest.  (Statsinger Decl. Ex. A ("Appl. for a Search Warrant").)  In support of the application, Agent Morales swore out an affidavit stating, "probable cause exists to believe that the subject cell phone was . . . used as part of the attempted sale of a machine gun and/or contains evidence of such an attempted sale."  (Id. Ex. A ("Warrant Aff.") ¶ 4.)  The Warrant Affidavit also stated that, several hours after DiMarco's arrest, Agent Morales observed "digital pictures of what appear[ed] to be the firearm seized during the arrest of DiMarco."  (Id. ¶ 12.)  Agent Morales clarified, however, that because DiMarco's cell phone "was examined prior to the issuance of a [search] warrant," she was "not asking the Court to rely on" the cell phone images that she had observed in order to find probable cause.  (Id. ¶ 16.)

Magistrate Judge James Francis issued a search warrant that same day, and Agent Morales subsequently recovered a cell phone from DiMarco that was the same Samsung make and model as the phone found in DiMarco's pocket at or about the time of his arrest.  (Gov't Post Hr'g Opp'n Mem. at 11-12; see also Gov't Opp'n Mem. at 2-3.)  During the search of this phone on April 17, 2012, however, the Government determined that the cell phone produced by DiMarco had a serial number different from the serial number on the cell phone which the NYPD had found on DiMarco during his arrest.  (Gov't Post Hr'g Opp'n Mem. at 11-12; see also Statsinger Decl. Ex. B ("Phone Examination Report Properties dated April 17, 2012").)  The search of this phone did not reveal any evidence of the pictures that Agent Morales had previously seen and the Government has since been unable to locate the cell phone that DiMarco possessed at or about the time of his arrest.  (Gov't Post Hr'g Opp'n Mem. at 11-12; see also Gov't Opp'n Mem. at 2.)

### III.   MOTION TO SUPPRESS

On June 25, 2012, DiMarco filed a motion to suppress "the evidence obtained from the illegal, warrantless search" of his cell phone on February 2, 2012, and "from the second warrantless search, which occurred on or about April 17, 2012."  (Statsinger Decl. at 6; see also Mot. to Suppress, ECF No. 16; Mem. in Supp. of Mot. to Suppress ("DiMarco Suppress Mem."), ECF No. 18.)  The Government filed a memorandum in opposition on July 9, 2012.  (Gov't Opp'n Mem., ECF No. 19.)  In its papers, the Government opposed DiMarco's motion to suppress the evidence and testimony relating to Agent Morales's February 2, 2012 search of the phone on the basis that the search fell within the "search incident to arrest exception" to the Fourth Amendment's warrant requirement.  (Id. at 8.)  In regards to the April 17, 2012 cell phone search, the Government stated that "it d[id] not wish to introduce the contents of the wrong phone at trial" and requested that this aspect of DiMarco's suppression motion be dismissed as moot.  (Id. at 8 (emphasis in original).)  The Suppression Hearing was held on September 12, 2012.  Two weeks later, on September 26, 2012, DiMarco submitted a post-hearing memorandum in support of his motion to suppress.  (DiMarco Post Hr'g Mem., ECF No. 27.)  The Government filed a post-hearing memorandum in opposition to the motion to suppress on October 10, 2012, (Gov't Post Hr'g Opp'n Mem., ECF No. 28), and on October 17, 2012, DiMarco filed a memorandum in reply, (DiMarco Post-Hr'g Reply Mem., ECF No. 29).

### IV.   APPLICABLE LEGAL STANDARD

In a motion to suppress evidence found in a warrantless search, a defendant must show that "he had a reasonable expectation of privacy in the . . . object searched."  United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993).  "If such a privacy interest is established, the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement" of the Fourth Amendment.  Id.; see also U.S. Const.,

amend. IV.  Where the Government cannot show that a warrantless search falls within any exception to the warrant requirement, the search is deemed unlawful and any "evidence of tangible materials seized during [the] unlawful search and of testimony concerning knowledge acquired during [the] unlawful search" must be excluded.  Murray v. United States, 487 U.S. 533, 536 (1988) (internal citations omitted); see also New York v. Harris, 495 U.S. 14, 18-19 (1990).

## V.    DISCUSSION

This Court has been unable to find any case from the Supreme Court or from the Second Circuit that has addressed facts that are on all fours with those presented here.  Other federal courts that have considered the lawfulness of cell phone searches incident to arrest have employed widely differing rationales to reach widely differing conclusions.[4]  This opinion will therefore examine the privacy interests protected by the Fourth Amendment, the authoritative cases articulating the application of the search incident to arrest exception, and the reasonableness of the search at issue here.  See Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (internal quotation marks omitted) ("The touchstone of [a court's] analysis under the

---

[4]The Fourth and Fifth Circuits, for example, have upheld cell phone searches that are contemporaneous with a lawful arrest, see, e.g., United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009); United States v. Finley, 477 F.3d 250, 260 (5th Cir. 2007); see also Silvan W. v. Briggs, 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished), as have several district courts, see, e.g., United States v. Curry, No. 07-100, 2008 WL 219966, at *8 (D. Me. Jan. 23, 2008); United States v. Valdez, No. 06 CR 336, 2008 WL 360548, at *2-4 (E.D. Wis. Feb 8, 2008); United States v. Deans, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008); United States v. Santillan, 571 F. Supp. 2d 1093, 1102 (D. Ariz. 2008); United States v. Parada, 289 F. Supp. 2d 1291, 1303 (D. Kan. 2003).  Multiple lower courts, however, have held that the warrantless search of a cell phone was not a legitimate part of a search incident to arrest.  See, e.g., United States v. Schmidt, No. 12 CR 6018, 2012 WL 3686645, at *5 (W.D.N.Y. July 9, 2012) report and recommendation adopted, 2012 WL 3686176 (W.D.N.Y. Aug. 24, 2012); United States v. Gibson, No. CR 11-734, 2012 WL 1123146, at *9-10 (N.D. Cal. April 3, 2012); United States v. Quintana, 594 F. Supp. 2d 1291, 1298-1301 (M.D. Fla. 2009); United States v. McGhee, No. 09 CR 31, 2009 WL 2424104, at *3-4 (D. Neb. July 21, 2009); United States v. Wall, 2008 WL 5381412, at *3-4 (S.D. Fla. Dec. 22, 2008) aff'd 343 F. App'x 564 (11th Cir. Sept. 4, 2009); United States v. Lasalle, No. CR 07-032, 2007 WL 1390820, at *7-8 (D. Hi. May 9, 2007); United States v. Park, No. CR 05-375, 2007 WL 1521573, at *9 (N.D. Cal. May 23, 2007).  There is also no real consensus among the state courts.  Compare People v. Diaz, 244 P.3d 501, 502 (Cal. 2011); Fawdry v. State, 70 So. 3d 626, 627 (Fla. Dist. Ct. App. 2011); Hawkins v. Georgia, 704 S.E.2d 886, 888 (Ga. Ct. App. 2010) with Ohio v. Smith, 920 N.E. 2d 949, 950 (Ohio 2009).

Fourth Amendment is always the reasonableness in all the circumstances of the particular

governmental invasion of a citizen's personal security.").

### A.  The Fourth Amendment

The Fourth Amendment to the United States Constitution provides that

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall issue, but upon
> probable cause, supported by oath or affirmation, and particularly
> describing the place to be searched, and the persons or things to be
> seized.

U.S. Const., amend. IV.  The  Supreme Court has recognized that "[t]he Amendment was in

large part a reaction to the general warrants and warrantless searches that had so alienated the

colonists and had helped speed the movement for independence."  Chimel v. California, 395 U.S.

752, 761 (1969).  The Court has viewed the Fourth Amendment's warrant requirement as critical

to safeguarding a person's privacy interests from unreasonable government intrusion.  See, e.g.,

McDonald v. United States, 335 U.S. 451, 455-56 (1948) ("Absent some grave emergency, the

Fourth Amendment has interposed a magistrate between the citizen and the police.  This was

done . . . . [because t]he right of privacy was deemed too precious to entrust to the discretion of

those whose job is the detection of crime and the arrest of criminals.").  Due to the importance of

these privacy interests, the Court has consistently considered searches conducted without a

warrant "per se unreasonable—subject only to a few specifically established and well-delineated

exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).

### B.  The Search Incident to Arrest Exception

The exception to the Fourth Amendment's warrant requirement upon which the

Government relies here is the exception that applies when a search is made incident to a lawful

arrest.  (Gov't Opp'n Mem. at 4-7; Gov't Post Hr'g Opp'n Mem. at 12-18.)  The Supreme Court

articulated the principles underlying this exception as early as 1914, when it stated in Weeks v. United States, 232 U.S. 383 (1914), that "[t]he right on the part of the government always recognized under English and American law, to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime . . . . has been uniformly maintained in many cases." Id. at 392; see also Agnello v. United States, 269 U.S. 20, 30 (1925); Carroll v. United States, 267 U.S. 132, 158 (1925).

The Supreme Court defined the modern parameters of the search incident to arrest exception in Chimel v. California, 395 U.S. 752 (1969), a case involving the arrest of a suspect in his home for the burglary of a coin shop. Id. at 753-54. During the arrest, the police searched the suspect's house, attic, and garage for evidence of the alleged burglary. Id. The Chimel Court concluded that such a search reduced Fourth Amendment protection to "the evaporation point," and sought to "mark [the] proper extent" of the search incident to arrest exception as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.

Id. at 762-63. In addition, the Chimel Court continued:

> [I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule . . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

Id.; see also Preston v. United States, 376 U.S. 364, 367 (1964) (discussing rationale for exception).

A few years after Chimel, the Supreme Court held in United States v. Robinson, 414 U.S. 218 (1973), that a search of "the arrestee's person" may also entail objects within the arrestee's garments.  Robinson involved the arrest of a suspect for operating a motor vehicle with a revoked license.  Id. at 220-21.  During a search incident to the driver's arrest, the arresting officer felt an object in the driver's coat pocket that he could not identify.  Id. at 221-23.  The officer reached into the pocket and pulled out a "crumpled up cigarette package."  Id. at 223.  The officer opened the cigarette package and found fourteen heroin capsules.  Id.  In rejecting Robinson's challenge to the search, the Court held that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search."  Id. at 235.

One year after Robinson, the Supreme Court addressed the unique issue of when an arrestee's clothing may be seized and searched in United States v. Edwards, 415 U.S. 800 (1974).  In Edwards, police arrested a suspect for attempting to break into a post office.  Id. at 801-02.  "[C]ontemporaneously with or shortly after the time Edwards went to his cell," the police became aware that his clothes were relevant to their investigation.  Id. at 805.  Because, however, "it was late at night" and "no substitute clothing was then available for Edwards to wear," the police did not take his clothes until approximately ten hours after his arrest when they had purchased other clothing for him to wear.  Id.

The Edwards Court determined that the officers, by waiting to seize and test the suspect's clothes for evidence, had acted reasonably because "it would certainly have been unreasonable for the police to have stripped respondent of his clothing and left him exposed in his cell throughout the night."  Id. at 806.  Of course, even if the officers had been aware of the relevance of Edwards's clothes at the time of his arrest, it would have been equally unreasonable to seize his clothes and strip him naked.  The Court further explained that taking the clothes was "no

13

more than taking from [the arrestee] the effects in his immediate possession that constituted evidence of crime" and that the officers "were entitled to do [so] incident to the usual custodial arrest and incarceration."[5]  Id. at 805.  The Court cautioned, however, that in upholding the search and seizure of the arrestee's clothing, it had "not conclud[ed] that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee." Id. at 808.

The Supreme Court next addressed the search incident to arrest exception in United States v. Chadwick, 433 U.S. 1 (1977).  Chadwick involved the search of a 200-pound locked footlocker that was seized during an arrest while the defendants were leaving a train station, but not searched until ninety minutes after the arrest when the footlocker was under the control of the agents who had seized it and no longer in the possession of the defendants.  Id. at 4.  Reasoning that the footlocker was "property not immediately associated with the person of the arrestee," the Chadwick Court explained that suppression of the evidence in the footlocker was necessary because "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest."  Id. at 15.  The Court further held that because the "the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after [the defendants] were securely in custody" the search could not "be viewed as incidental to the arrest or as justified by any other

---

[5]The Supreme Court's opinion in Edwards also noted that there had been "testimony that [taking clothes from a suspect] was the standard practice in th[e] city."  415 U.S. at 804-05.  The Supreme Court therefore explained that, because Edwards's clothes had not been seized at the time of his arrest, "the normal processes incident to arrest and custody had not been completed when Edwards was placed in his cell."  Id.  But "[w]ith or without probable cause," the Edwards Court continued, "the authorities were entitled at that point not only to search Edwards's clothing but also to take it from him and keep it in official custody."  Id.

exigency."  Id.  Finally, the Court reasoned that, "[u]nlike [the] searches of the person [in

Robinson and Edwards]," the Fourth Amendment's privacy protections meant that "searches of

possessions within an arrestee's immediate control c[ould] not be justified by any reduced

expectations of privacy caused by the arrest.  Respondents' privacy interest in the contents of the

footlocker was not eliminated simply because they were under arrest."[6]  Id. at 16 n.10 (internal

citations omitted).

More recently, the Supreme Court addressed the reasonableness of a search incident to

arrest in Arizona v. Gant, 556 U.S. 332 (2009).  In Gant, police officers arrested the defendant

for driving with a suspended license, handcuffed him, and then locked him in the back of a patrol

car.  Id. at 335.  While the defendant was sitting in the locked patrol car, the police searched his

vehicle and discovered cocaine in the pocket of a jacket that had been lying on the vehicle's

backseat.  Id.  In concluding that such a search was unlawful under the search incident to arrest

---

[6]Two years after Chadwick, the Supreme Court decided Arkansas v. Sanders, 442 U.S. 753 (1979), which held that "the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to such luggage in other locations."  Id. at 765.  Both Chadwick and Sanders were later abrogated in, California v. Acevedo, 500 U.S. 565 (1991), which held that police may conduct a warrantless search of a container within a vehicle if they have probable cause to believe that the container holds contraband or evidence.  Acevedo thus overruled the "Chadwick-Sanders Rule" requiring "separate treatment for an automobile search that extends only to a container within the vehicle."  Id. at 576.  However, the decision in Acevedo did not undermine the validity of Chadwick's holding with respect to a custodial search incident to arrest.  See Groh v. Ramirez, 540 U.S. 551, 561 (2003) (recognizing abrogation of Chadwick on other grounds); United States v. Maddox, 614 F.3d 1046, 1049 (9th Cir. 2010) (relying on Chadwick's holding that the search of an item within an arrestee's immediate control must not be too remote in time or place from the time and place of the arrest); United States v. Han, 74 F.3d 537, 542 n.2 (4th Cir. 1996) ("Chadwick has been overruled only as to closed containers seized from inside an automobile.").

Since Chadwick, the Second Circuit has evaluated a warrantless search under the search incident to arrest exception, by distinguishing between searches of the "arrestee's person" and searches of the "possessions within an arrestee's immediate control."  See, e.g., United States v. Lartey, 716 F.2d 955, 965-66 (2d Cir. 1983) (concluding that there was no justification under Chadwick for a warrantless search of an arrestee's briefcase under the search incident to arrest exception if the search of the briefcase occurred after the arrest had been made and there was no danger that evidence would be destroyed or that the safety of the agents was in jeopardy); see also United States v. O'Razvi, No. 97 CR 1250, 1998 WL 405048, at *7 n.7 (S.D.N.Y. July 17, 1998), aff'd, 173 F.3d 847 (2d Cir. 1999) (discussing the impact of Chadwick on search incident to arrest analysis).  The reasonableness of a search, however, has always remained the primary inquiry of a court's analysis under the Fourth Amendment.  See Mimms, 434 U.S. at 108-09; see also Arizona v. Gant, 556 U.S. 332, 338-39 (2009) (discussing reasonableness inquiry under search incident to arrest exception).

exception, the Supreme Court held that officers performing a search incident to an arrest for a suspended license may search the passenger compartment of a vehicle "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe that the vehicle contains evidence of the offense of arrest." Id. at 351.  The Court stated that permitting an automobile search where either of these two conditions was not met "untether[ed] the rule from the justifications" underlying the search incident to arrest exception—promoting officer safety and preventing the destruction of evidence.[7]  Id.

### C.  Arguments Advanced by DiMarco and the Prosecution

Analogizing the facts of this case to Robinson and Edwards, the Government argues that the search of DiMarco's cell phone fell within the search incident to arrest exception.[8]  (Gov't Post Hr'g Opp'n Mem. at 12-20.)  To support its argument, the Government relies on a Fifth Circuit case, United States v. Finley, 477 F.3d 250 (5th Cir. 2007), cert denied, 549 U.S. 1353 (2007), that was published two years prior to Gant.  In Finley, the defendant, Jacob Pierce Finley, drove a methamphetamine dealer to a pre-arranged drug sale with an undercover officer. Id. at 253-54.  Local police officers then arrested Finley and the methamphetamine dealer three

---

[7]Although Gant involved the search of an automobile and the Supreme Court has treated the search of an automobile under a different analytic framework for the purpose of Fourth Amendment searches, at least one circuit court has ruled that "there is no plausible reason why Gant should be held to apply only with respect to automobile searches, rather than in any situation where the item searched is removed from the suspect's control between the time of the arrest and the time of the search."  United States v. Shakir, 616 F.3d 315, 318 (3d Cir. 2010).

[8]The modern search incident to arrest exception also includes an exception for the "routine" inventory of an arrestee and any article on the arrestee's person incident to incarcerating that arrested person.  Illinois v. Lafayette, 462 U.S. 640, 648 (1983); see also Florida v. Wells, 495 U.S. 1, 4 (1990) ("[A]n inventory search must not[, however,] be a ruse for a general rummaging in order to discover incriminating evidence."); Lartey, 716 F.2d at 966 (distinguishing between "search incident to a lawful arrest" and search that "was part of a routine standardized administrative procedure for making a valid inventory . . . as an incident to booking and incarcerating an arrested person").  The routine inventory exception is not relevant to the current case, however, because the Government does not seek to justify the search of DiMarco's cell phone under this rationale.  Furthermore, the NYPD in inventorying the articles found in DiMarco's possession makes no record of the search of the contents of DiMarco's cell phone, although it did perform an inventory the phone and its battery, before returning both to DiMarco.  (Cf. Gov't Exs. 1-7.)  Thus, there is no evidence that the search of the contents of DiMarco's phone was part of the NYPD's standard inventorying or arrest processing procedures.  Cf. United States v. Flores, 122 F. Supp. 2d 491, 494-96 (S.D.N.Y. 2000) (granting motion to suppress evidence found during purported "inventory search" of calendar book and cell phone where there was no evidence that either item was searched according to the established inventory search procedures).

to five miles from where the sale took place.  Id. at 254.  In the process of making the arrest, the officers searched the vehicle that Finley had been driving and found in a trash can between the driver and passenger seats, the same marked bills that had been used in the drug sale.  Id.  The police also found two medicine bottles in the trash can, one bottle contained 1.5 grams of a crystalline substance later determined to be methamphetamine.  Id.  The other bottle had a label with Finley's name on it and contained a small, homemade glass, smoking pipe with methamphetamine residue in it.  Id.  After discovering this evidence, the officers arrested Finley, performed a search of his person, and recovered a cell phone from his pocket.  Id.

The officers then took Finley and the phone to the home of the methamphetamine dealer, where agents from the Drug Enforcement Administration ("DEA") were conducting a search of the home pursuant to a warrant.  Id.  While Finley was at the home of the methamphetamine dealer and well before any arrest processing or property inventorying at the precinct had begun, an agent with the DEA searched Finley's phone for recent calls and text messages, found several messages on the phone that suggested narcotics transactions, and confronted Finley with these text messages.  Id. at 254-55.  Finley then confessed to using cocaine and methamphetamine and to distributing marijuana at least once, but denied any involvement in the methamphetamine sale to the undercover officer.  Id.  A jury later convicted Finley for aiding and abetting possession with intent to distribute methamphetamine.  Id. at 255.

In affirming the denial of Finley's motion to suppress the call records and text messages retrieved from his cell phone, the Fifth Circuit construed Finley's cell phone to be an element of his person[9] and applied the holding in Robinson to find that "no warrant was required [to search Finley's phone] since the search was conducted pursuant to a valid custodial arrest."  Id. at 260.

_____

[9]Notably, Finley conceded that his cell phone was "analogous to a closed container" on his person and did not raise the argument that the phone should be construed as a property within his immediate control.  See Finley, 477 F.3d at 260.

In dicta in a footnote, the <u>Finley</u> Court also explained that "[t]he fact that the search took place after the police transported Finley to [his co-defendant's] residence d[id] not alter [its] conclusion" because, "[a]lthough the police had moved Finley, the search was still contemporaneous with his arrest and therefore permissible."  <u>Id.</u> at 260 n.7.  Because the search of Finley's phone was contemporaneous with his arrest, the <u>Finley</u> Court also stated in dicta that, "as long as the administrative processes incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest."  <u>Id.</u>  (citing <u>Edwards</u>, 415 U.S. at 803).[10]

### D.  Analysis

#### i.  <u>DiMarco's Protectable Privacy Interest in His Cell Phone</u>

A defendant may establish that he has a right protected under the Fourth Amendment by showing that he had a subjective expectation of privacy that society is prepared to recognize as reasonable and justifiable.  <u>See</u> <u>Perea</u>, 986 F.2d at 639; <u>see also</u> <u>Katz</u>, 389 U.S. at 360-61 (Harlan, J., concurring).  Here, DiMarco argues that he has a protectable privacy interest in his cell phone because it "is much more akin to a small computer than to a traditional telephone," and as such, has the capacity to contain an immense amount of private, personal information. (DiMarco's Post Hr'g Mem. at 22; <u>see</u> <u>also</u> Tr. at 90 (describing what was searched on DiMarco's cell phone).)  The Government concedes that "[i]n this respect, [DiMarco] is absolutely correct."  (Gov't Post Hr'g Mem. at 19.)  Thus, given the unique and significant

---

[10]DiMarco contests the Government's assertions that <u>Finley</u> is applicable to this case and that Agent Morales's search of his cell phone fell under the search incident to arrest exception.  In addition, DiMarco also argues that the Government should be judicially estopped from asserting that Agent Morales's search of his cell phone was lawful where the Government "previously took the position that the search was illegal" in its Warrant Affidavit filed on April 12, 2012.  (DiMarco Post Hr'g Mem. at 9.)  However, a close reading of the Warrant Affidavit reveals that, because DiMarco's cell phone had been examined prior to the issuance of any warrant, Agent Morales merely asked the Court not "to rely on" the fact that she had seen incriminating images on the phone in order to find that probable cause existed to issue a search warrant.  (Warrant Aff. ¶ 16.)  Because this statement does not show that the Government previously took the position that its February 2, 2012 search was illegal, DiMarco's judicial estoppel argument is rejected.

information-storing capabilities of the modern cell phone, DiMarco did have a privacy interest in the cell phone that the NYPD officers found in his pocket at or about the time of his arrest on February 2, 2012.  See also Finley, 477 F.3d at 259 (An arrestee has a "reasonable expectation of privacy in the call records and text messages on [his] cell phone"); Wurie, 612 F. Supp. 2d at 109 ("It seems indisputable that a person has a subjective expectation of privacy in the contents of her cell phone.").

ii.   Reasonableness of the Search of DiMarco's Cell Phone

Because DiMarco had a privacy interest in the cell phone that the NYPD officers found in his pocket at or about the time of his arrest, Agent Morales's warrantless search of his phone was lawful if—as the Government argues—it was reasonable to conduct the search pursuant to the search incident to arrest exception.  Here, due to the timing of the search and the justifications that Agent Morales stated for conducting it, the search of DiMarco's cell phone on February 2, 2012 did not properly fall within the search incident to arrest exception.

First, the timing of Agent Morales's search of DiMarco's cell phone makes it unreasonable to conclude that the search was performed incident to or contemporaneous with his arrest.  Even the Government admits that more than six hours passed between DiMarco's arrest and the search of his cell phone.  (See generally Gov't Post Hr'g Opp'n Mem. at 15 (chart establishing timing and events on February 2, 2012); see also Tr. at 69-70, 91-94; Gov't Exs. 3, 8.)  By comparison, almost all of the courts of authority that have upheld the search of a cell phone under the search incident to arrest exception, contemplated searches that occurred as, or soon after, a suspect was arrested.  See, e.g., Murphy, 552 F.3d at 411-12 (initial search of cell phone occurred when arrestee handed phone to arresting officer); Curry, 2008 WL 219966, at *10 (search occurred "within less than a half hour of defendant's arrest"); Santillan, 571 F. Supp. 2d at 1102 (search occurred "mere minutes after the arrest and seizure" of phone).

Even in <u>Finley</u>, the case upon which the Government relies, the cell phone search was contemporaneous to Finley's arrest because the DEA Agent searched the phone during the course of investigative activities in the field and well before the police took him to the police station to begin processing the arrest and inventorying the items seized.  <u>See</u> 477 F.3d at 254-55, 260.  In addition, multiple courts have determined that cell phone searches occurring within much fewer than six hours were not sufficiently contemporaneous to be considered an incident of an arrest.  <u>See, e.g.</u>, <u>Gibson</u>, 2012 WL 1123146, at *10 (finding that search of cell phone was not incident to arrest where search took place approximately one to two hours after arrest); <u>Lasalle</u>, 2007 WL 1390820, at *7 (finding that search of cell phone was not incident to arrest where search was conducted "somewhere between two hours and fifteen minutes to three hours and forty-five minutes" after arrest); <u>Park</u>, 2007 WL 1521573, at*8 (finding that search of cell phone was not incident to arrest where search took place ninety minutes after arrest); <u>see also</u> <u>Chadwick</u>, 433 U.S. at 15 (concluding that search of locked trunk ninety minutes after an arrest was too remote in time and place to be incident to the arrest).

Although the Government asserts that it is relying on the search incident to arrest exception as discussed in <u>Edwards</u>, and not the inventorying procedure exception, for the proposition that a search may be incident to a lawful custodial arrest so long as the administrative procedures inherent to the arrest are ongoing, (Gov't Post Hr'g Opp'n Mem. at 14), this is too simplistic a reading of <u>Edwards</u>.  The police in <u>Edwards</u> determined that, "contemporaneously with or shortly after" the suspect was arrested, they had probable cause to believe that the clothing which Edwards was wearing was material evidence of the crime for which he had been arrested.  <u>See</u> 415 U.S. at 804-05.  However, the police did not conduct a search of Edwards's clothes at that time—even though it was a standard city practice to do so—because they did not have substitute clothing available for him to wear.  <u>Id.</u> at 805.  On this basis, the <u>Edwards</u> Court

20

concluded that the search of his clothes ten hours after his arrest was reasonable because it would have been unreasonable to remove his clothes at that time and leave the suspect naked for a night.  See id.  Edwards is further distinguishable from the facts here because, unlike the routine practice of searching a defendant's clothes during arrest and inventorying processing in Edwards, there was no evidence in the record that NYPD officers routinely searched the contents of arrestees' cell phones.  Moreover, although the Edwards Court stated in dictum that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," id. at 806,  this statement does not obviate the need for a search to be timely or the need for it to be reasonable.  Edwards "explicitly confirmed that its decision was not to be interpreted as "conclud[ing] that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee." Id. at 806.

Second, the delayed search of DiMarco's cell phone was unreasonable because the reasons that Agent Morales stated for conducting the search are not relevant to the justifications underlying the search incident to arrest exception.  DiMarco's cell phone presented no threat to the officers.  Cf. Chimel, 395 U.S. 752 at 773 (justifying warrantless search incident to arrest because "[t]here is always a danger that the suspect will try to escape, seizing concealed weapons with which to overpower and injure the arresting officers").  Nor has the Government, which has the burden of proof to show reasonableness, shown that DiMarco would have been able to destroy the evidence on his cell phone once the phone was placed under the exclusive authority of the NYPD.[11]  See id. (justifying warrantless search incident to arrest because "there is [also] a danger that [a suspect] may destroy evidence vital to the prosecution").

---

[11]In its brief, the Government introduces the specter of "instant wiping" by which a button can be pressed that wipes a phone and its contents clean.  (Gov't Post Hr'g Mem. at 19 (citing United States v. Flores-Lopez, 670 F.3d 803, 807-08 (7th Cir. 2012).)  But the Government submitted no testimony or evidence to show if the potential for instant

At the suppression hearing, Agent Morales testified that—after she was introduced to the NYPD officers who had arrested DiMarco—she "scrolled through" DiMarco's cell phone because she wanted "to see if there was any evidence on th[e] phone linking it to . . . the person they had arrested and the firearm that was there."  (Tr. at 89.)  Agent Morales further explained that she performed the search at that time because she had "never met this police officer" before and she "didn't know what his particular process" for handling the evidence was.  (Id. (emphasis added).)  Agent Morales's explanation reflects that she performed a purely exploratory search of DiMarco's cell phone based on her concern that a NYPD officer at the 43rd Precinct—and not DiMarco—might erase or somehow lose the information stored on it.  But this explanation does not support the warrantless search of DiMarco's cell phone because, as the Second Circuit has made clear, "arresting agents are not allowed to simulate circumstances warranting application of the incident-to-arrest exception . . . ."[12]  Perea, 986 F.2d at 643.  Moreover, Agent Morales had other avenues to pursue that would have been far less intrusive of DiMarco's privacy.  Agent Morales, for example, could have requested that the NYPD officers place DiMarco's cell phone into a NYPD evidence vouchering bag and requested that no officers at the 43rd Precinct open

---

wiping—either directly on the phone or remotely—was a credible or reasonable concern underlying the search in this case.  The Government has therefore not presented evidence sufficient to show that there was a likelihood that the images on DiMarco's cell phone might have been erased in this manner.  In addition, this Court distinguishes its consideration of the search of DiMarco's cell phone from the cases that the Government cites involving pagers. (See, e.g., Gov't Opp'n Mem. at 5; Gov't Post Hr'g Opp'n Mem. at 13 n.1); see also United States v. McCray, No. CR 408-231, 2009 WL 29607, at *3-4 (S.D. Ga. Jan. 5, 2009) (providing thorough discussion of federal cases that have upheld the search of a pager under the search incident to arrest exception).  Although both devices do store phone numbers, a pager, unlike a modern cell phone, is susceptible to deleting stored information as new pages are received, or when it is turned on and off.  See Wall, 2008 WL 5381412, at *4 (discussing the "differences in technology between pagers and cell phones" and describing these differences as "cut[ing] to the heart of th[e destruction of evidence] issue."); see also United States v. Reyes, 922 F. Supp. 818, 835 (S.D.N.Y. 1996) (discussing exigent circumstances inherent to pager technology as justifying the search of a pager incident to arrest); United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (same).  The difference between the two devices therefore is one of kind, not one of degree.

[12]Agent Morales's proffered exigency rationale is further undercut by the assertion that she made in her Warrant Affidavit after the search of the phone stating, "[f]rom my conversations with [a Special Agent with expertise in technical matters, including the storage of information on cellular phones and other electronic devices,] I have learned that even if someone manually deletes photographs, text messages, or other electronic information from a cellular phone, it may be possible for such information to be retrieved."  (Warrant Aff. ¶ 15.)

the bag until she had obtained a warrant for its search.  To this end, Agent Morales could have also disabled the cell phone by not re-inserting the battery into the back of the phone after she had removed it and by placing the phone and the battery into separate evidence vouchering bags.

Given the text and purpose of the Fourth Amendment, its "constitutional provisions for the security of person and property should be liberally construed."  Mapp v. Ohio, 367 U.S. 643, 647 (1961) (citing Boyd v. United States, 116 U.S. 616, 630 (1886)).  "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."  Id.   In this case, the search of DiMarco's cell phone was unlawful under the search incident to arrest exception because the search occurred more than six hours after DiMarco had been arrested by the NYPD and thus it was not incident to his arrest and because the reasons that Agent Morales stated for the search indicate that the search was exploratory and rummaging in nature, and not based on the factual circumstances that had led to DiMarco's arrest.

A different result might have been reached if the NYPD officers who conducted the arrest of DiMarco had testified that they needed to search DiMarco's cell phone at the time of his arrest on account of exigent circumstances or to pursue a timely lead relevant to the alleged gun sale. No such justification was provided, however.

As for the routine inventorying exception recognized in some opinions, see, e.g., Lafayette, 462 U.S. at 648, the failure of the arresting officers to search and record the contents of DiMarco's cell phone evidences that it was not the NYPD's practice to do so during arrest processing, (cf. Gov't Exs. 1-7), and there is no evidence in the record such searches were the "standard practice in th[e] city."  Cf. Edwards, 415 U.S. at 804.  Once DiMarco was in the custody of the NYPD and his cell phone removed from his possession, the justifications for the search incident to arrest exception disappeared.  See Chimel, 395 U.S. at 766 ("No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is

allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items.").

Accordingly, DiMarco's motion to suppress the evidence obtained by Agent Morales pursuant to her warrantless search of his cell phone on February 2, 2012 is granted.  In addition, because the Government does not seek to admit any evidence obtained from the April 17, 2012 search of DiMarco's cell phone, this aspect of DiMarco's motion to suppress is denied as moot.

## VI.    CONCLUSION

For the reasons stated above, DiMarco's motion to suppress the evidence obtained from the search of his cell phone that was found in his pocket at or about the time of his arrest on February 2, 2012 is GRANTED.  DiMarco's motion to suppress any evidence obtained from the Government's April 17, 2012 search of his other cell phone is DISMISSED AS MOOT.

Given that this case was made so unusual and complex by the novel question of law presented in DiMarco's suppression motion, the Court, on its own motion and pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), excludes the last sixty-five days from the time computed under the Speedy Trial Act.  The Court finds that the ends of justice are served by granting such a continuance and sets trial for February 26, 2013.

Any voir dire requests, in limine motions, or requests to charge must be submitted to the Court by February 15, 2013.

IT IS SO ORDERED.

Dated: New York, New York
February 5, 2013

_____
Robert P. Patterson, Jr./S
U.S.D.J.

**COPIES OF THIS ORDER WERE SENT TO:**

Counsel for Defendant Benny DiMarco

       Jonathan Marvinny
       Federal Defenders of New York
       52 Duane St., 10th Floor
       New York, NY 10007
       Phone: (212) 417-8792
       Fax: (212) 571-0392
       Email: Jonathan_Marvinny@fd.org

Counsel for the Government

       Martin S. Bell
       Assistant U.S. Attorney
       Southern District of New York
       One St. Andrew's Plaza
       New York, NY 10007
       Phone: (212) 637-2463
       Fax: (212) 805-0421
       Email: Martin.Bell@usdoj.gov